**Catherine McNAIR, Ancillary Administratrix for the Estate of Edward Earl McNair, Plaintiff–Appellant,**

and

**Edward Earl McNair, deceased, Plaintiff,**

v.

**LEND LEASE TRUCKS, INCORPORATED; Lend Lease Dedicated Services, Incorporated, Defendants–Appellees,**

and

**Robert Monroe, Administrator of the Estate of Thomas Paul Jones; Thomas Paul Jones, deceased, Defendants.**

No. 93–2528.

United States Court of Appeals,
Fourth Circuit.

Argued June 8, 1994.

Decided Aug. 21, 1995.

---

**ARGUED:** Karen M. Rabenau, Blanchard, Twiggs, Abrams & Strickland, P.A., Raleigh, NC, for appellant. John C. Millberg, Millberg & Gordon, P.L.L.C., Raleigh, NC, for appellees. **ON BRIEF:** Douglas B. Abrams, Blanchard, Twiggs, Abrams & Strickland, P.A., Raleigh, NC, for appellant. Richard N. Cook, Maupin, Taylor, Ellis & Adams, P.A., Raleigh, NC, for appellees.

Before HALL and HAMILTON, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion, Senior Judge PHILLIPS wrote the majority opinion in which Judge HAMILTON joined. Judge K.K. HALL wrote a dissenting opinion.

## OPINION

PHILLIPS, Senior Circuit Judge:

Catherine McNair, ancillary administratrix of the estate of Edward Earl McNair, brought action in state court against Thomas Paul Jones and his employers, Lend Lease Trucks, Inc. and Lend Lease Dedicated Services, Inc., seeking damages for the wrongful death of her intestate. Following removal of the case on grounds of diversity, and the entry of default judgment against Jones, the United States District Court held that McNair failed to state a claim against the employers under the doctrine of respondeat superior because Jones was not acting within the course and scope of his employment at the time of McNair's death, and so granted the employers' Rule 12(b)(6) motion to dismiss. On McNair's appeal, we affirm.

I

The general facts, as alleged in the complaint and accepted as true for purposes of this appeal, are as follows. Thomas Paul Jones was employed by Lend Lease Trucks, Inc. and Lend Lease Dedicated Services, Inc. ("Lend Lease" or "Lend Lease defendants") as an interstate tractor-trailer driver. On May 25, 1991, Jones was on an interstate assignment for the Lend Lease defendants. "Before dusk"[1] on that day, Jones parked the tractor-trailer rig on the shoulder of U.S. Highway 301 near Kenly, North Carolina and crossed the highway to have dinner at the Dry Dock Lounge. In addition to eating at the restaurant, Jones consumed an unspecified quantity of alcoholic beverages. He remained in the restaurant until approximately 11:15 p.m. at which time he left the restaurant and began crossing the highway in order to return to his rig. While attempting to cross U.S. 301, Jones "darted" in the path of a motorcycle driven by Edward McNair. Both McNair and Jones were killed in the ensuing collision.

Catherine McNair brought this wrongful death action against Jones and the Lend Lease defendants in state court alleging that the collision and McNair's death were proximately caused by Jones' negligent and grossly negligent conduct while acting in the course and scope of his employment by the Lend Lease defendants. Following removal of the action, default judgment was entered against Jones' estate. On the motion of the Lend Lease defendants under Fed.R.Civ.P. 12(b)(6), the district court dismissed the vicarious liability claim against those defendants on the stated basis that Jones was not

---

1. This was the time expressly pleaded in the complaint. The district court properly took judicial notice, agreed to by McNair, that the "clock time" of dusk on that date was between 7:00 and 8:00 p.m. J.A. 33. We accept that as fact.

acting within the course and scope of his employment with Lend Lease at the time of the collision.[2]

This appeal followed.

## II

■ The issue is whether the district court erred in ruling that, as a matter of law on the record before the court, Jones was not acting within the scope of his employment when he darted into the path of McNair's motorcycle on his ill-fated attempted passage from the Dry Dock Lounge to his tractor-trailer rig. We review that ruling *de novo*, which means on the full record properly before the district court, and independently of the district court's particular legal reasoning or evidentiary assessment. *See generally* 10 Wright, Miller & Kane, *Federal Practice & Procedure: Civil* § 2716, at 658–60 (1983).

North Carolina substantive law controls the decision in this diversity case. The relevant substantive principles from that source are the familiar ones generally applicable to the determination of respondeat superior tort liability in this type of case. The content of these familiar principles is not in dispute, only their application to the facts properly before the court. We summarize the principles most relevant here.

■ The basic principle of course is that an innocent employer (master) is vicariously liable for injuries (or death) proximately caused by the negligence of his employee (servant) if the negligent conduct occurred while the employee was acting within the course and scope of his employment. *See Parrott v. Kantor*, 216 N.C. 584, 6 S.E.2d 40, 43 (1939). The agreed issue here in application of that basic principle is whether at the time he "darted in the path" of McNair's oncoming motorcycle, Jones was acting in the course and scope of his employment by his Lend Lease employers. There is no dispute that on the facts as alleged in McNair's complaint, Jones was then negligent and that his negligence was the proximate cause of McNair's death.

■ As to that dispositive "course and scope of employment" issue, the relevant principle under North Carolina law, as generally, is well-settled in formulation. As typically put, it embraces both what it means to be "within the course and scope," and how an employee may depart from that scope by "going on a frolic of his own," to employ the ancient phrase.

> A servant is acting in the course of his employment when he is engaged in that which he was employed to do, and is at the time about his master's business. He is not acting in the course of his employment if he is engaged in some pursuit of his own. Not every deviation from the strict execution of his duty is such an interruption of the course of employment as to suspend the master's responsibility, but, if there is a total departure from the course of the master's business, the master is not answerable for the servant's conduct.

*Id.*; *see also Gallop v. Clark*, 188 N.C. 186, 124 S.E. 145, 147 (1924) ("whether done … in furtherance [of master's business]"; "incident to the performance of duties").

■ And there is the subsidiary "frolic and detour" principle which becomes relevant when an employee who has sufficiently "deviated" from the "strict execution of his duty" to "suspend the employer's responsibility" arguably has later re-entered upon the duties of his employment. In such a situation "the relation of master and servant is not restored until [the servant] has returned to the place where the deviation occurred, or to a corresponding place, some place where in the performance of his duty he should be." *Kantor*, 6 S.E.2d at 43; *see also Duckworth v. Metcalf*, 268 N.C. 340, 150 S.E.2d 485, 488–89 (1966); *Hinson v. Virginia–Carolina Chemical Corp.*, 230 N.C. 476, 53 S.E.2d 448, 451–52 (1949).

Invoking these principles, the parties joined issue in the district court, and continue to join issue here, on two questions: (1) whether, as a matter of law on the facts properly before the district court, Jones *ever*

---

**2.** The court also dismissed McNair's alternative claims against the Lend Lease defendants on theories of negligent entrustment and statutory-

employer liability under state and federal law. McNair has not challenged dismissal of those alternative claims on this appeal.

sufficiently deviated from the course and scope of his employment to relieve the Lend Lease defendants of vicarious responsibility, and (2) whether, if he did so deviate, he had sufficiently returned to the performance of his duty at the time he darted into the path of McNair's motorcycle that he was then back within the course and scope of his employment.

McNair's contention, both in the district court and here, is that on the bare factual record before the court it could not be said as a matter of law that Jones *ever* departed. Specifically, she argues that it only appears from the record that Jones left his rig to get food and drink and that while doing so he "began to consume" *some* alcoholic beverages. Neither of these standing alone, she says, as a matter of law constitutes a sufficient deviation to take him outside the course and scope of his employment. Alternatively, she argues that if at some point by virtue of the duration of his stay for food and drink or his consumption of alcohol, or both, he could properly be held to have deviated sufficiently, it could not be said as a matter of law that he had not yet returned to the performance of his duties when, demonstrably on the way to his rig, the accident occurred. Indeed, she contends, we should rule that, as a matter of law on the facts of record, he never departed, or, that if he did, he had sufficiently returned to the performance of his duties when he left the Dry Dock Lounge with the intent to return to his rig. On this basis, she asks that we reverse the district court and either effectively rule that Lend Lease is vicariously liable, or at least remand for further proceedings in which the facts may be more fully developed.

On the other side, the Lend Lease defendants have conceded that stopping for food and drink and consuming alcoholic beverages while doing so do not, standing alone, take a truck-driver employee outside the course and scope of his employment as a matter of law. They contend, however, that the combination of a three or four-hour stop that includes the consumption of alcohol does as a matter of law constitute a sufficient deviation to take him outside the course and scope of employ-

ment. And, they argue that as a matter of law Jones could not be held to have re-entered the scope of his employment until at least such time as he might have reached his rig and resumed his trip. Accordingly, they contend that the district court properly dismissed the vicarious liability claim on the record before it.

Addressing the issues so presented, the district court held that as a matter of law on the facts as alleged in McNair's complaint, Jones embarked "on a mission of his own" which took him outside the course and scope of his employment "when [he] left his truck to cross the road to obtain food and drink," or, alternatively, "when he chose to remain in the bar and consume alcoholic beverages" from "sometime between 7:00 and 8:00 p.m." until 11:15 p.m. And, the court held, as a matter of law on the facts as alleged, that "Jones would not have returned to the course and scope of his employment until he reached the truck where he could do what he was required to do: drive that truck." J.A. 30–37 (Memorandum of Decision). On this basis, the court dismissed the vicarious liability claim for failure of the complaint to state a claim upon which relief could be granted.

Reviewing *de novo* that dismissal, we agree, but on slightly different grounds than those of the district court.

### III

For purposes of our *de novo* review, it is important at the outset to identify the facts which under the relevant dismissal standard are properly before us. This is important because we include in those facts one which the district court, presumably out of an abundance of caution and because it was thought not critical, apparently declined to consider. This is the fact that, as revealed by autopsy, Jones' blood-alcohol content at the time of the accident was .28, which, as a matter of judicial notice, is a full eighteen points above the legal limit of .1 for operating motor vehicles in North Carolina. The district court, noting the fact and its origin in McNair's own submission,[3] indicated that it

---

3. The medical report of the autopsy was filed by

McNair in an admittedly confused effort to re-

was not a factor in its decision because the court "had not considered matters outside the complaint as it might have done by treating defendants' motion to dismiss as one for summary judgment under [Fed.] Rule [of Civ. Proc.] 56." J.A. 34.

Because we believe that that additional fact *is* critical—or certainly substantially bolstering—to the district court's dismissal, we do consider it. We may properly do so—as could have the district court—notwithstanding that the motion to dismiss was made under *Fed.R.Civ.P.* 12(b)(6), which directly challenges only the legal sufficiency of the claim as pleaded. As the district court realized, under that Rule's terms the court might have considered the fact as one properly before it, effectively converting the motion into one for summary judgment. *Id.* The reason that it ordinarily is not appropriate in ruling on a Rule 12(b)(6) motion to consider matters outside the pleadings is because of the pleader's lack of opportunity to contest the matters. But as we have recognized, that danger is not present where, as here, "a party is aware that material outside the pleadings is before the court." *Gay v. Wall,* 761 F.2d 175, 177 (4th Cir.1985). Here, that certainly is the case. McNair's counsel, responding to the district court's specific inquiry as to why she had attached the blood-alcohol medical report to her response to the defendants' Rule 12(b)(6) motion, stated that it was because of the perceived possibility that the motion might be treated as one for summary judgment and her resulting belief that "of course we had to respond." J.A. 62–63.

With that fact therefore one properly to be considered along with those alleged in the complaint, we have the following indisputable facts. Sometime between 7:00 and 8:00 p.m., Jones, employed by Lend Lease to deliver goods by truck, parked his rig by the roadside and walked across the road to a cafe-lounge to get food and drink. He remained in the cafe-lounge for a total of three to four

hours before coming out at around 11:15 p.m. and starting back across the road toward his parked rig. Sometime during the three to four hours he was in the Dry Dock Lounge, he had consumed enough alcohol to get his blood-alcohol content to a full eighteen points above the level at which he might legally operate his rig under state law.[4] While attempting his passage back across the highway in the intoxicated state this content revealed, he "darted" into the path of McNair's oncoming motorcycle and was killed, along with McNair, in the resulting collision.

We pass the question whether, under controlling law and on these facts, Jones departed from the scope of his employment immediately, as the district court held, upon leaving his parked rig to go to the Dry Dock Lounge for food and drink. An answer to that possibly dicey question of state law and its application need not be ventured here. We can go instead to the district court's alternative ruling that a sufficient departure necessarily occurred at some time before Jones left the lounge three or four hours later.

The district court thought that departure was established as a matter of law from the bare facts, as alleged in the complaint, of the stay's duration of three to four hours and the consumption during its course of *some* alcoholic beverages. Again, we pass whether those facts alone would have sufficed to allow dismissal. The district court thought they compelled the inference that Jones first ate, then was "left with a minimum of two hours and fifteen minutes for drinking." J.A. 33. That might be a permissible inference for a fact-finder, but we could not hold that it is one compelled as a matter of law by these facts alone. If there were no more facts than those alleged in the complaint, it might be as reasonable to infer, certainly more favorable to McNair to infer, that Jones drank one beer, ate a leisurely meal, and whiled away the remainder of his stay in idle social pur-

spond to the Lend Lease defendants' motion to dismiss, which had pointed out the report's existence and its contents. J.A. 62–63, 86–87. Confused and tactically ill-advised as this might have been (though it was readily available to support a formal motion for summary judgment), the re-

port and its contents were clearly thereby placed "before the court."

4. A fact of which the district court properly took judicial notice, J.A. 34; as may we.

suits, consuming no more alcohol and never becoming intoxicated.

If that were the most favorable factual inference to which McNair was entitled, difficult questions of state law would be presented.[5] We need not address them, however, because all the difficulties fall away when to those facts is added the further one that Jones went into the lounge sober and came out three or four hours later in a state of intoxication that made it illegal for him to drive the vehicle he was employed to drive.

■ Under North Carolina law, as generally, an employee can go "on a frolic of his own" not only by physically leaving his post of duty or "detouring" from an assigned route of travel, but by engaging in conduct which though it occurs while he is on duty and physically on the post or route of duty, is in no way "about," or "in furtherance of," "his master's business." *See, e.g., Medlin v. Bass,* 327 N.C. 587, 398 S.E.2d 460, 463–64 (1990) (school principal's sexual assault on student in his office during duty hours outside scope of employment); *Wegner v. Delly–Land Delicatessen, Inc.,* 270 N.C. 62, 153 S.E.2d 804, 808 (1967) ("not sufficient to hold the employer liable that the wrongful act occurred while the employee was at his post of duty during the hours of work").

That is the type of deviation or "frolic" truly at issue here. And though, as the district court noted, there is no North Carolina decision squarely on point, we are satisfied that the North Carolina courts would hold that a truck-driver employee who while en route on an assigned trip takes a three to four hour rest or meal break during which he consumes sufficient alcohol to make it illegal for him to drive his truck further, has thereby departed from the course and scope of his employment. At exactly what point—whether when he first exceeded the legal limit or earlier—is of no consequence. At least from the time he renders himself legally incapacitated to be "about his employer's business," while not being then "about" it, he surely must be considered outside the scope of his employment.[6] We therefore agree with the district court's conclusion—though by a different route of analysis—that at some time before he left the Dry Dock Lounge, Jones had departed from the course and scope of his employment.

■ That brings us to the district court's further ruling that, as a matter of law on all the facts properly before the court, Jones had not returned to the scope of his employment by the time of the collision. Again we agree, though again on somewhat different reasoning that takes into account the degree-

5. Whether, for example, a rest stop's sheer duration, if not its taking at all, constitutes a per se departure from the scope of employment; whether becoming intoxicated to any extent while engaged in this type employment constitutes such a departure; whether the two in combination would. The parties agree that there is no specific North Carolina authority on these issues.

6. This is a different situation from that of the employee who while operating a motor vehicle on an assigned mission but in an intoxicated state negligently causes injury to another. That situation may invoke the principle that the fact that in inflicting injury an employee acts not only tortiously but criminally, hence violates his employer's (at least) implicit instructions, does not necessarily constitute a departure from the scope of his employment. *See, e.g., West v. F.W. Woolworth Co.,* 215 N.C. 211, 1 S.E.2d 546, 549 (1939) ("[T]he question of [vicarious] liability does not depend on the quality of the act, but rather upon the question whether it has been performed in the line of duty."). The critical distinction is that in those circumstances the employee, though acting both tortiously and

criminally in inflicting the injury, nevertheless does so while acting "in furtherance of his master's business"—*e.g.* transporting goods toward an intended destination. *See id.* ("[I]t is the fact that he was about his master's business that imposes liability. That he adopted a ... method expressly prohibited does not excuse the employer from liability."). Here, at the time Jones rendered himself legally incapacitated to continue on his assigned duty, he was in no way "furthering his employer's business," which was getting a truck and its contents from one place to another. While Jones pursued a purely personal course of action in getting drunk, the employer's truck was going nowhere. *Cf. Chastain v. Litton Systems, Inc.,* 694 F.2d 957, 962 (4th Cir.1982) (applying North Carolina law) (emphasizing that the critical issue in such situations may be the time and circumstances under which the employee became intoxicated). Had Jones succeeded in getting back across Highway 301 to his rig, starting it up and getting back on his assigned route only to collide with McNair further down the road while still intoxicated, we would have a different legal issue, though not necessarily a different legal result in the end.

of-intoxication fact that the district court says it did not consider.

The parties and the district court discussed this issue largely by reference to the rules governing returns from physical-detours. So the inquiry centered on the point in space at which Jones, having "departed" could be said to have returned to the path of duty. As we have noted, however, the "frolic" here at issue is best viewed as a "conduct-frolic," rather than a "physical-detour" frolic. Therefore, while there are obvious analogies to be drawn from the "detour-return" rules and decisions, they do not fit perfectly where the departure has been by conduct (irrespective of location). The district court recognized this, wondering how the physical-detour-return rule would apply to Jones' conduct here: "[W]hen did he return? ... when he formed the intention to return to his truck? ... when he stood up ... to leave? when he paid the cashier? ... etc." And, addressing the issue in those terms, the district court thought the only possible answer—given the impossibility of choosing any of those posited—was "not until he reached the truck...." J.A. 36.

The more appropriate focus, which avoids the logical dilemma of locating any physical point of return, is on the time at which the departure caused by Jones' conduct ceased to exist. Here that departure was the state of legal incapacity from intoxication caused by Jones' conduct. It could only have ceased, allowing Jones to return to the scope of his employment, when his blood-alcohol content dropped at least to the legal limit for performing his duty. That obviously had not occurred by the time of the collision. Hence, for that reason, the district court correctly ruled that Jones had not by that time returned to the scope of his employment.

## IV

Because the district court did not err in ruling that as a matter of law Jones was not acting within the scope of his employment when his negligence proximately caused McNair's death, we affirm the court's dismissal of McNair's claim of vicarious liability against the Lend Lease defendants.

*AFFIRMED.*

K.K. HALL, Circuit Judge, dissenting:

I agree with the majority's conclusion that Jones deviated from his master's business "at some time before he left the Dry Dock lounge...." *Ante* at 657. I am of the opinion, however, that Jones would have reentered the scope of his employment not upon sobering up (either completely or to a level at which "his blood alcohol content dropped at least to the legal limit for performing his duty." *Ante* at 657), but rather upon his taking action to return to his duties, however intoxicated he may have been upon such return.

Whether Jones's attempted return to his truck constituted a return to the scope of his employment is a question for the factfinder. Lend Lease concedes that merely stopping for dinner and consuming alcohol did not as a matter of law take a truck driver outside the scope of his employment. *Ante* at 655. Intoxication also does not automatically remove an employee from the scope of his employment. Had Jones stopped, filled his cab with beer, resumed his driving duties, become intoxicated *while driving* toward his scheduled destination, and *then* collided with McNair's motorcycle, certainly the conduct-frolic analysis espoused by the majority would dictate judgment for the employer. Ample authority exists, however, for finding respondeat superior liability in circumstances involving drunk employees. *See, e.g., Garcia v. United States,* 799 F.Supp. 674, 681 (W.D.Tex.1992) ("[T]he employer should not be allowed to absolve itself of all the liability merely because its employee is legally intoxicated.").[*] Jones departed from the furtherance of his

---

[*] The majority's analogy to "conduct frolics" involving assaults is unconvincing. In *Medlin, ante* at 657, the sexual assault was *activity* that was clearly not furthering the business of the school-system employer. Similarly, the assault by the busboy in *Wegner, ante* at 657, involved injury-causing *conduct* that was held to be outside the

scope of his employment. In the case before us, however, the conduct that allegedly caused the injury was negligently walking across the road toward the truck. Jones's intoxication at the time of the accident is relevant to the negligence issue, but not to the scope question.

master's business not *by drinking*, but rather by staying two to three hours *to drink*. When the conduct-frolic ended—when the imbibing stopped, not when Jones' blood-alcohol level subsided—Jones may then have resumed his duties at some point soon afterward. That point should be the same for an intoxicated Jones as for a sober one.

I would vacate the judgment below and remand for further proceedings.