Merrell v. Smith, 2020 NCBC 93.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

CARL E. MERRELL; LYLE RANSON;
JEANETTE RANSON; CRAIG S.
MILLER; WANDA EDWARDS
MILLER; and ROBERT J. NASTASE,

Plaintiffs,

v.

JAMES M. SMITH; JENNIFER
SMITH; and CAROLINA BEVERAGE
GROUP, LLC f/k/a CAROLINA BEER
& BEVERAGE, LLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

19 CVS 21650 [MASTER FILE]
Related Cases:
19 CVS 22027
19 CVS 23665
19 CVS 23856

**ORDER AND OPINION ON
DEFENDANT CAROLINA
BEVERAGE GROUP, LLC'S
MOTION TO DISMISS COMPLAINTS
UNDER RULE 12(b)(6) OF THE
NORTH CAROLINA RULES OF
CIVIL PROCEDURE
[AMENDED]**[1]

1.     **THIS MATTER** is before the Court on the Motion to Dismiss Complaints

Under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Motion to

Dismiss" or the "Motion") filed by Defendant Carolina Beverage Group, LLC, f/k/a

Carolina Beer & Beverage, LLC ("CBB"), in three pending Mecklenburg County

actions the Court refers to collectively as the "CBB Cases": (1) *Merrell, et al. v. Smith,

et al.*, (19 CVS 21650); (2) *Strack, et al. v. Smith, et al.*, (19 CVS 22027); and (3)

*Cochrane, et al. v. Smith, et al.*, (19 CVS 23665).[2]

2.     Although the Court has not determined whether the CBB Cases shall be

consolidated for trial, the Court and the parties previously agreed on a coordinated

approach to discovery and motions practice.  (*See* ECF Nos. 25 [19 CVS 21650]; 34

---

[1]  This Amended Order and Opinion is being issued to correct the case caption.

[2]  A fourth case involving similar allegations, *Short v. Smith, et al.*, was voluntarily dismissed
on September 28, 2020.  (ECF No. 86 [19 CVS 23856].)

[19 CVS 22027]; 18 [19 CVS 23665] ["Case Mgmt. Plan"].) Consistent with that agreement, CBB filed the Motion to Dismiss as one coordinated motion, along with a Memorandum in Support of the Motion, requesting dismissal of all claims that the plaintiffs in the CBB Cases (together, "Plaintiffs") have asserted against CBB. (ECF Nos. 45–46 [19 CVS 21650]; 60–61 [19 CVS 22027]; 46–47 [19 CVS 23665] ["Mot. to Dismiss" and "Mem. in Supp."].) The three operative complaints subject to the Motion to Dismiss are (1) the Second Amended Complaint filed in *Merrell* (the "Merrell Complaint"); (2) the Second Amended Complaint filed in *Strack* (the "Strack Complaint"); and (3) the Amended Complaint filed in *Cochrane* (the "Cochrane Complaint") (together, "Plaintiffs' Complaints"). (ECF Nos. 24 [19 CVS 21650] ["Merrell Compl."]; 33 [19 CVS 22027] ["Strack Compl."]; 7 [19 CVS 23665] ["Cochrane Compl."].)

3.    For the reasons set forth in this Order and Opinion, the Court **GRANTS** in part and **DENIES** in part the Motion to Dismiss.

*Hemmings & Stevens, by Aaron C. Hemmings, for Plaintiffs.*

*Winston & Strawn, LLP, by Amanda L. Groves, Kevin Y. Zhao, and Timothy G. Hughes, for Defendant Carolina Beverage Group, LLC, f/k/a Carolina Beer & Beverage, LLC.*

Robinson, Judge.

## I. FACTUAL BACKGROUND[3]

4. The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss. Instead, the Court only recites the factual allegations, taken from Plaintiffs' Complaints and their attachments, that are relevant to the Court's determination of the Motion to Dismiss.

### A. Introduction

5. The parties vary across the CBB Cases, but each action involves the same core allegations. (*See generally* Merrell Compl.; Strack Compl.; Cochrane Compl.) Plaintiffs are former members of CBB, a North Carolina limited liability company ("LLC"), and allege that Defendant James Michael Smith ("Michael"), a CBB officer possessing inside information, selectively notified the late Richard C. Siskey ("Siskey") in 2006 that a private equity firm had expressed interest in purchasing CBB and that CBB was also close to finalizing a lucrative bottling franchise deal. (Merrell Compl. ¶¶ 1, 4, 12, 14, 34.)

6. After learning this inside information, Siskey allegedly devised a fraudulent scheme to purchase Plaintiffs' respective ownership interests in CBB, at less than the true value of the interests, prior to CBB's sale. (Merrell Compl. ¶¶ 35, 49.) Plaintiffs claim that Michael and his wife Defendant Jennifer Smith ("Jennifer"), an employee of CBB (together, the "Smiths"), helped Siskey defraud Plaintiffs by

---

[3] Plaintiffs' Complaints each contain nearly verbatim factual allegations about the alleged fraudulent scheme underpinning the CBB Cases. Therefore, the Court deems it appropriate, for purposes of enhancing readability and avoiding unnecessarily large citations, to cite to the numbered allegations in one complaint only, the Merrell Complaint, for much of this section. The Court notes where there are specific allegations that vary within or across each of Plaintiffs' Complaints.

concealing the inside information about CBB from Plaintiffs, and in return for their help, Siskey gave the Smiths many lavish gifts. (Merrell Compl. ¶¶ 13, 39, 44, 67.)

7. According to Plaintiffs, the scheme perpetrated by Siskey and the Smiths resulted in Siskey unfairly reaping millions of dollars following the sale of CBB while Plaintiffs received nothing when CBB was sold. (Merrell Compl. ¶¶ 1, 4–5, 82.)

**B.** **The Parties**[4]

8. Although the parties differ across the three CBB Cases, the plaintiffs in each case assert identical claims against CBB and the Smiths.

9. The *Merrell* case involves claims by Carl E. Merrell, Lyle Ranson, Jeanette Ranson, Craig S. Miller, Wanda Edwards Miller, and Robert J. Nastase against CBB and the Smiths. (Merrell Compl. ¶¶ 6–14.)

10. In the *Strack* action, Jeffrey A. Strack, Penny N. Strack, James C. Wilson, Roy Lynam, Pamela Boileau, Dallas Pendry, Jr., Mallory Johnson, Rita Dilling, Carolyn Crozier, Thomas J. Crozier, Jr., and Kent Kalina have brought claims against CBB; the Smiths; Metropolitan Life Insurance Company ("MetLife Insurance"); MSI Financial Services, Inc., f/k/a MetLife Securities, Inc. ("MSI") (MetLife Insurance and MSI together, the "MetLife Defendants"); and the estate of Siskey, as administered by F. Lane Williamson ("Siskey's Estate").[5] (Strack Compl. ¶¶ 8–20, 23–25.)

---

[4] On May 28, 2020, Plaintiffs in all three CBB Cases voluntarily dismissed all their claims against Home Run Holdings, LLC. (ECF Nos. 41 [19 CVS 21650]; 56 [19 CVS 22027]; 40 [19 CVS 23665].)

[5] Scott Keck, a former plaintiff in the *Strack* case, voluntarily dismissed all his claims against all defendants on September 28, 2020. (ECF No. 102 [19 CVS 22027].)

11. Finally, in the *Cochrane* litigation, Jeffrey Neal Cochrane and Gary Alan Cochrane, as co-administrators of the estate of Ralph Neal Cochrane,[6] have brought claims against CBB, the Smiths, the MetLife Defendants,[7] and Siskey's Estate.[8] (Cochrane Compl. ¶¶ 8–11, 14–16.)

## C. CBB's Formation

12. Michael formed CBB in 1997. (Merrell Compl. ¶¶ 21.) That same year, he and Siskey became business partners when they formed an entity called Wall Street Investments, LLC, f/k/a Consolidated Investments, LLC. (Merrell Compl. ¶¶ 20, 24.) Three years later, Michael asked Siskey to help him raise capital to launch CBB. (Merrell Compl. ¶ 26.) At the time, Siskey worked as an insurance agent and securities broker for the MetLife Defendants. (Merrell Compl. ¶ 22.) Siskey agreed to help Michael, and they both began marketing CBB to Siskey's existing insurance and investment clients, which included Plaintiffs. (Merrell Compl. ¶¶ 27–29.)

13. With Siskey's assistance, Michael was able to raise the start-up capital for CBB by selling ownership interests in CBB to thirty-five of Siskey's clients, including Plaintiffs. (Merrell Compl. ¶ 30.) Plaintiffs purchased their respective interests in CBB between 2001 and 2003. (Merrell Compl. ¶¶ 101–02, 119–21, 139–41, 159–61;

---

[6] Ralph Neal Cochrane, now deceased, was a former member of CBB. His sons Jeffery Neal Cochrane and Gary Alan Cochrane were not members, though they seek relief on behalf of their father's estate. (Cochrane Compl. ¶¶ 1, 8, 164–65, 176.)

[7] The MetLife Defendants have filed a separate motion to dismiss in the *Strack* and *Cochrane* actions, which the Court will address in a separate order and opinion. (ECF Nos. 62 [19 CVS 22027]; 48 [19 CVS 23665].)

[8] On October 30, 2020, the *Cochrane* plaintiffs voluntarily dismissed the claims asserted against John D. Phillips in that case. (ECF No. 89 [19 CVS 23665].)

Strack Compl. ¶¶ 147–48, 165–67, 187–88, 236–37, 256–57, 279–80, 298–99, 319–21, 340–41; Cochrane Compl. ¶¶ 164–65.)

14. After raising the start-up capital for CBB, and during the time period relevant to Plaintiffs' allegations, Michael was CBB's majority interest holder and its Chief Executive Officer ("CEO"), and Jennifer was employed by CBB as a Special Projects Leader. (Merrell Compl. ¶¶ 12–13, 31.) Siskey received a five percent ownership interest in CBB for his assistance, which he eventually sold back to the company and to some of his clients between 2003 and 2005. (Merrell Compl. ¶¶ 27, 31, 33.)

**D.    The Alleged Fraudulent Scheme Begins**

15. The alleged scheme at the center of Plaintiffs' Complaints began with an email from Michael to Siskey dated December 11, 2006, in which Michael communicated that he had been "approached by an investment group seeking to purchase [CBB]" and that CBB was close to finalizing a "Cap Can [franchise] deal." (Merrell Compl. ¶ 34, Ex. 1.) Upon receiving this "material non-public insider information," Siskey formed a plan to "fraudulently purchase" the ownership interests of the clients he had previously advised to invest in CBB, so he could "cash in on the impending sale" of CBB. (Merrell Compl. ¶ 35.)

16. Recognizing that Michael, as CBB's majority interest holder, would need to approve the transfer of any ownership interests in the company (CBB had a right of first refusal), Siskey sought to secure Michael's cooperation in his scheme to purchase his clients' interests. (Merrell Compl. ¶¶ 36–37.) Plaintiffs claim that, in early 2007,

Siskey and the Smiths "formed and agreed upon a plan with . . . Siskey to allow [Siskey] to fraudulently purchase shares of stock in [CBB] from his clients." (Merrell Compl. ¶ 39.) The plan, according to Plaintiffs, involved the Smiths concealing from Siskey's clients the same material inside information that Michael had selectively given to Siskey, so that Siskey could mislead his clients when advising them to sell their interests in CBB. (Merrell Compl. ¶¶ 47–49.) In exchange for their assistance, Siskey allegedly gave the Smiths many expensive gifts. (Merrell Compl. ¶¶ 37–38, 40, 67–68.)

### E. The Smiths' Communications with Siskey and CBB's Members

17. After Siskey and the Smiths developed a plan to defraud Siskey's clients, the Smiths regularly updated Siskey on the progress of CBB's negotiations with (1) the private equity firm seeking to purchase CBB and (2) Austria-based company Red Bull regarding a distribution contract. (Merrell Compl. ¶¶ 41, 81.)

18. Plaintiffs also identify the following communications between the Smiths and Siskey that took place in 2007, which Plaintiffs contend were connected to the plan to defraud Siskey's clients, including Plaintiffs.

    a. On February 14, 2007, Michael sent an email to Siskey, in which Michael stated that he had recently reported to Plaintiffs' Individual Retirement Account ("IRA") custodian that the CBB stock that Plaintiffs owned was worth $150,000 per share. (Merrell Compl. ¶ 48, Ex. 6.) Michael made this valuation "for the purpose of misleading . . . Plaintiffs and allowing . . . Siskey to make

misrepresentations to his clients."[9]  (Merrell Compl. ¶ 48.)

b. On February 21, 2007, Jennifer emailed Siskey to give him advance notice of an upcoming annual business meeting for CBB's members, scheduled for March 29, 2007.  (Merrell Compl. ¶ 45, Ex. 5.)

c. On November 12, 2007, Sisky sent an email to Jennifer with a list of clients, including some of the plaintiffs, from whom Siskey allegedly "had fraudulently obtained an agreement to redeem their [CBB] stock." (Merrell Compl. ¶ 61, Ex. 13.)  In that email, Siskey asked Jennifer how he should deliver to the Smiths the consent forms for those stock transfers.  (Merrell Compl., Ex. 13.)  Jennifer responded that Siskey could either send the forms by overnight mail or he could hand deliver them to the Smiths' home.  (Merrell Compl., Ex. 14.)

d. In a November 13, 2007 email exchange between Siskey and Jennifer, Siskey referred to "Operation Zero," which Plaintiffs contend was the name Siskey and the Smiths gave to their fraudulent scheme.  (Merrell Compl. ¶ 64, Ex. 16.)

19.    The Smiths also communicated with CBB's members in 2007.  On March 2, 2007, Jennifer sent an email to CBB's members, giving them notice of the March 29, 2007 annual business meeting. (Merrell Compl., Ex. 5.)  This March 2, 2007 notice

---

[9] Although Plaintiffs' Complaints each contain the general allegation that Michael reported this value to Plaintiffs' IRA custodian, the complaints do not specifically allege that Craig S. Miller, Wanda Edwards Miller, Jeffrey A. Strack, Penny N. Strack, and James C. Wilson had an IRA account with this custodian.  (*See* Merrell Compl. ¶¶ 137–55); Strack Compl. ¶¶ 142–80.)

did not disclose to the members the CBB inside information that Michael had shared with Siskey in December 2006.  (Merrell Compl. ¶ 45, Ex. 5.)  Nor did Michael disclose this information to CBB's members at the March 29, 2007 meeting.  (Merrell Compl. ¶ 45.)

**F.      Siskey Purchases Plaintiffs' Ownership Interests in CBB**

20.     From September 2007 through March 2008, Siskey purchased 15.25 shares of CBB stock from his clients, including Plaintiffs, for total payments of $3,872,500. (Merrell Compl. ¶¶ 53, 57, 103–06, 122–26, 142–46, 162–65, Ex. 7; Strack Compl. ¶¶ 102, 108, 149–51, 168–71, 190–93, 238–242, 260–63, 282–84, 301–03, 323–25, 342–45, Ex. 22; Cochrane Compl. ¶¶ 117, 125, 168–69, Ex. 24.)  According to Plaintiffs, the Smiths knew about all these transactions because Michael and Jennifer together processed them, and Michael approved them as the holder of a majority interest in CBB. (Merrell Compl. ¶¶ 54–55.)

21.     Siskey allegedly acquired Plaintiffs' shares by employing two tactics.  One tactic was to advise some plaintiffs that the time was right to redeem their CBB stock for a profit.  (*See* Merrell Compl. ¶¶ 103–06, 142–46, 162–65; Strack Compl. ¶¶ 149–51, 168–71, 190–93, 260–63, 282–84, 301–03, 323–25, 342–45; Cochrane Compl. ¶¶ 168–69.)  After these plaintiffs agreed to redeem their stock, Siskey bought the stock for himself.  (*See, e.g.*, Merrell Compl. ¶ 106.)  Siskey's other tactic was to offer to purchase some plaintiffs' CBB stock directly for a price above what they had initially paid for the stock.  (Merrell Compl. ¶¶ 122–26; Strack Compl. ¶¶ 238–42.)

22.     Regardless of whether they agreed to redeem their CBB stock or sell it directly to Siskey, Plaintiffs allege that neither Siskey nor the Smiths disclosed to Plaintiffs prior to the sale the same CBB inside information Michael had previously given to Siskey. (Merrell Compl. ¶¶ 109, 129.) Had they known about this information, Plaintiffs allege they would not have sold their stock. (Merrell Compl. ¶ 180.)

23.     Plaintiffs also assert that the Smiths continued to withhold this information from them and process/approve stock transfer forms even after a law firm representing CBB delivered a letter dated October 3, 2007 to Siskey (with a copy to Michael) that stated as follows:

> Dear Rick [Siskey]:
>
> We have recently found out from Michael Smith that Carolina Beer & Beverage, LLC management has been looking at certain options regarding a sale of either a portion or all of the company's business assets. It is our understanding that you have also recently been made aware of this possible sale. Given this information and the recent proposed transfers of membership interests to you, we believe that we should inform you of possible liabilities that may arise in this situation.
>
> In our opinion, the broad reach of the securities antifraud rule 10B-5 applies to these transactions. Among other restrictions, rule 10B-5 makes it unlawful for any person to make any untrue statement of a material fact or to omit to state a material fact in connection with the purchase or sale of any security. In particular, if you have knowledge regarding the company and its future plans, including the plans to sell the company, then you must share that knowledge with the members of the company whose interests you intend to buy. This fact is very material to the members' decisions to sell their interests.
>
> You should also know that the rules and regulations related to Rule 10B-5 imply a right to a private remedy for violation of the rules. Thus, any investor from whom you purchase an interest that is not fully informed of all the information you know may have a cause of action against

you. We do not know what you or the investors are aware of but given the information we have recently learned from Mr. Smith, we wanted to make sure we informed you of possible issues that may arise regarding proposed transfers once you have become aware of the sale of the company.

Given this information, we have advised Mr. Smith to withhold his consent from transfers of any more interests until all members of the company are made aware of management's current plans. We believe that this action is prudent given the possible liability that may be incurred by many different parties if any more sales of interests occur without all parties having knowledge of all the relevant information. We understand that Mr. Smith is sending a notice to all investors soon.

If you have any questions or require anything further regarding these matters, please contact me.

> Sincerely,
>
> WISHART, NORRIS, HENNINGER & PITTMAN, P.A.
>
> Gary W. Smith

cc: Mr. Michael Smith, Carolina Beer & Beverage, LLC

(Merrell Compl., Ex. 11; *see also* Merrell Compl. ¶¶ 56–58.)

### G. The SunTx Partners Sale and the Red Bull Deal

24. In 2009, private equity firm SunTx Partners purchased CBB. (Merrell Compl. ¶¶ 76–77.) CBB also finalized the distribution contract with Red Bull that year. (Merrell Compl. ¶ 81.)

25. According to Plaintiffs, as a direct result of the SunTx Partners transaction, Siskey received over $20,000,000 based on his ownership of the 15.25 shares of CBB stock he had fraudulently purchased from his clients, including Plaintiffs, for $3,872,500. (Merrell Compl. ¶ 80, Ex. 7.) Plaintiffs, on the other hand, received

nothing from the sale of CBB. (Merrell Compl. ¶ 82.) Plaintiffs allege that SunTx Partners ultimately sold its majority interest in CBB to Byrnwood Partners in May 2018, leading to more distributions for CBB's members, including Siskey's Estate, as a result of that transaction. (Merrell Compl. ¶ 92–93.)

## II.    PROCEDURAL BACKGROUND

26.    Plaintiffs initiated the CBB Cases in November 2019 (*Merrell* and *Strack*) and December 2019 (*Cochrane*). (ECF Nos. 2 [19 CVS 21650]; 3 [19 CVS 22027]; 3 [19 CVS 23665].) Each case was designated to the Business Court and assigned to the undersigned. (ECF Nos. 1 [19 CVS 21650]; 1, 2 [19 CVS 22027]; 1, 2 [19 CVS 23665].) The three operative complaints challenged by the Motion to Dismiss were filed on January 28, 2020 (*Cochrane*) and March 10, 2020 (*Merrell* and *Strack*). (Merrell. Compl.; Strack Compl.; Cochrane Compl.)

27.    On June 1, 2020, CBB timely filed the Motion to Dismiss. (Mot. to Dismiss.) The Motion has been fully briefed. (Mem. in Supp.; ECF Nos. 58 [19 CVS 21650]; 80 [19 CVS 22027]; 63 [19 CVS 23665] ["Mem. in Opp'n"]; ECF Nos. 61 [19 CVS 21650]; 83 [19 CVS 22027]; 66 [19 CVS 23665] ["Reply Br."].) On October 5, 2020, the Court held a hearing by video conference on the Motion, at which all parties were represented by counsel. The Motion is now ripe for resolution.

## III.    LEGAL STANDARD

28.    When ruling on a Rule 12(b)(6) motion to dismiss, the Court views the complaint's allegations in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017). The Court

analyzes "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). As part of this analysis, the Court treats all well-pleaded factual allegations as true. *See Krawiec v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation omitted). Additionally, the Court may consider documents attached to and incorporated into the complaint without converting the Rule 12(b)(6) motion to dismiss into a motion for summary judgment. *See Moch v. A.M. Pappas & Assocs., LLC.*, 251 N.C. App. 198, 206, 794 S.E.2d 898, 903 (2016).

29.     Granting a Rule 12(b)(6) motion is proper when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (citation omitted). The Supreme Court of North Carolina "routinely uses [this] Rule 12(b)(6) standard . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 615 n.7, 821 S.E.2d at 737.

## IV. ANALYSIS

30. CBB moves to dismiss each of the following eight claims that Plaintiffs have asserted against it: (1) breach of fiduciary duty, (2) fraud by omission/concealment, (3) fraud in the inducement, (4) state securities fraud, (5) constructive fraud, (6) civil conspiracy, (7) negligent misrepresentation in the alternative, and (8) vicarious liability/respondeat superior. (Mot. to Dismiss; Mem. in Supp. 2, 7.) As an artificial entity, CBB can only act through its agents, *see Technetics Group Daytona, Inc. v. N2 Biomedical, LLC*, 2018 NCBC LEXIS 116, at *7 (N.C. Super. Ct. Nov. 8, 2018), which makes Plaintiffs' vicarious liability/respondeat superior claim the natural starting point for the Court's analysis.[10]

### A. Vicarious Liability/Respondeat Superior

31. Relying on the respondeat superior doctrine, Plaintiffs assert that CBB is vicariously liable for the claims they have lodged against the Smiths (i.e., breach of fiduciary duty, fraud by omission/concealment, fraud in the inducement, state securities fraud, constructive fraud, civil conspiracy, and negligent misrepresentation). (*See* Merrell Compl. ¶ 287; Strack Compl. ¶ 524; Cochrane Compl. ¶ 365.)

32. Under the respondeat superior doctrine, an employer may be held vicariously liable for its employee's misconduct in three situations: (1) when the

---

[10] Although Plaintiffs' Complaints repeatedly allege that CBB and Michael are or acted as "alter egos" of each other, (*see, e.g.*, Merrell Compl. ¶¶ 16, 179, 208, 211, 221, 278), Plaintiffs have not asserted a veil piercing claim or otherwise pled the elements to support such a claim. *See Gurkin v. Sofield*, 2020 NCBC LEXIS 49, at *22–24 (N.C. Super. Ct. Apr. 15, 2020) (explaining the doctrine of reverse veil piercing, under which an entity can be held personally liable for its majority owner's actions).

misconduct is expressly authorized by the employer; (2) when the misconduct is committed within the scope of the employee's employment and in furtherance of the employer's business; or (3) when the misconduct is ratified by the employer. *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 296, 603 S.E.2d 147, 157 (2004).

33.     Plaintiffs appear to argue that CBB can be held vicariously liable for the Smiths' alleged misconduct on the basis of all three situations described above. (Mem. in Opp'n 4–5.)  However, Plaintiffs' Complaints specifically assert a scope of employment theory, and they do not contain factual allegations suggesting that Plaintiffs are pursuing a respondeat superior claim against CBB based on the other two situations. (*See* Merrell Compl. ¶ 286; Strack Compl. ¶ 523; Cochrane Compl. ¶ 364.)  Therefore, the Court will only analyze whether Plaintiffs have sufficiently stated a claim for respondeat superior liability against CBB with regard to the scope of employment situation, not the other two situations.

34.     The jury ordinarily decides whether an employee's misconduct was committed within the scope of his/her employment and in furtherance of the employer's business. *See Medlin v. Bass*, 327 N.C. 587, 593, 398 S.E.2d 460, 463 (1990).  But when the misconduct is "so clearly outside the scope of employment," the trial court may resolve a respondeat superior claim, as a matter of law, in favor of the employer. *Id.* at 594, 398 S.E.2d at 464.

35.     Here, CBB contends that the Smiths' alleged misconduct, "engaging in a private fraud scheme," was "clearly outside of the legitimate scope of their relationship with [CBB]." (Mem. in Supp. 12.)  CBB also argues that Plaintiffs'

Complaints establish that this alleged scheme only furthered the Smiths' private interests, not CBB's business, since Plaintiffs allege that the Smiths and Siskey, not CBB, were the sole beneficiaries of the scheme to defraud Plaintiffs. (Mem. in Supp. 11–13.)

36. The Court is not persuaded. To begin with, CBB does not to cite to, and the Court's research has not revealed, any controlling law requiring a plaintiff to specifically plead that an employer benefited from its employee's misconduct to sustain a respondeat superior claim against the employer. *Cf. Troxler v. Charter Mandala Ctr., Inc.,* 89 N.C. App. 268, 271, 365 S.E.2d 665, 668 (1988) ("To be within the scope of employment, an employee, at the time of the incident, must be acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment. . . . If an employee departs from that purpose to accomplish a purpose of his own, the principal is not liable."). Therefore, Plaintiffs' failure to specifically allege that CBB benefited from the Smiths' conduct is not fatal to their vicarious liability/respondeat superior claim against CBB.[11] In addition, by narrowly focusing on who benefited from the alleged fraud, CBB overlooks the Court of Appeals'

---

[11] Notably, CBB attempts to distinguish Plaintiffs' vicarious liability/respondeat superior claim from the respondeat superior claim that the Court declined to dismiss in another case involving the MetLife Defendants and Siskey, *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *61–65 (N.C. Super. Ct. Dec. 31, 2019). (Mem. in Supp. 13.) However, CBB ignores the Court's determination in *Aldridge* that the MetLife Defendants' contention—that "the activities conducted" by the MetLife Defendants' employees "were private matters that personally benefitted Siskey, not the MetLife Defendants"—required the Court to "go[] beyond the allegations contained in the four corners of the Complaints and [was] therefore not appropriate on the Court's consideration of the Rule 12(b)(6) motions." 2019 NCBC LEXIS 116, at *62. Importantly, the Court did not conclude in *Aldridge* that a plaintiff is required to specifically plead that the employer benefited from its employee's misconduct in order to maintain a respondeat superior claim. *See id.* at *61–65.

decision in *White v. Consolidated Planning, Inc.,* 166 N.C. App. at 283, 603 S.E.2d at 147, which provides useful guidance concerning the scope of employment issue in the context of alleged fraudulent conduct.

37. There, the Court of Appeals considered whether an employee's alleged intentional misconduct (misappropriating a plaintiff investor's funds) had been committed within the scope of his employment with the defendant insurance company. *Id.* at 287–91, 296, 603 S.E.2d at 152–54, 157. In analyzing this issue, the Court of Appeals explained that "the critical question [was] whether the [misconduct] *was committed in the course of activities that the employee was authorized to perform.*" *Id.* at 298, 603 S.E.2d at 158 (emphasis added); *see also id.* at 297, 603 S.E.2d at 157 ("The general rule is that a principal is responsible to third parties for the fraud of its agent while acting within his authority." (quoting *Thrower v. Coble Dairy Prods. Co-operative, Inc.,* 249 N.C. 109, 111, 105 S.E.2d 428, 430 (1958))). And since the plaintiff had presented evidence showing that the employee had been able to misappropriate the funds by exploiting his assigned jobs duties, the Court of Appeals concluded that there was a genuine issue of material fact as to whether the employee had acted within the scope of his employment with the defendant. *Id.* at 299–300, 603 S.E.2d at 159.

38. Here, there are allegations that, if proven true, could support a determination that the Smiths were able to, in conjunction with Siskey, defraud Plaintiffs by exploiting their assigned job duties as CEO and Special Projects Leader of CBB, similar to how the employee exploited his assigned job duties in *White.* For

example, Michael's email to Siskey stating that Michael had been approached by an investment group interested in purchasing CBB contained Michael's CEO title. (*See, e.g.*, Merrell Compl. ¶ 34, Ex. 1.)  That email is relevant to Plaintiffs' claims.  Also, when Jennifer emailed Siskey to give him advance notice about the March 29, 2007 business meeting for CBB's members, it appears that she sent that email from her "carolinabeer.com" account. (*See, e.g.*, Merrell Compl. ¶ 45, Ex. 5.) This communication is relevant to Plaintiffs' claims because Siskey apparently was not a member of CBB at the time.  Lastly, when Siskey and Jennifer exchanged emails about stock transfer consent forms that needed to be processed and approved by the Smiths in connection with the alleged plan to defraud Plaintiffs, it appears that Jennifer again used her "carolinabeer.com" account for these communications.  (Merrell Compl. ¶¶ 61–63, Ex. 13–15.)

39.    At this preliminary stage, then, the Court concludes that Plaintiffs have sufficiently stated a respondeat superior claim against CBB based on a scope of employment theory.  Thus, to the extent that Plaintiffs' vicarious liability/respondeat superior claim against CBB is premised on this theory, the Court denies CBB's request to dismiss the claim.  CBB is free to revisit this scope of employment issue after discovery and on a more developed record.

**B.    Breach of Fiduciary Duty and Constructive Fraud**

40.    The Court next turns to Plaintiffs' breach of fiduciary duty and constructive fraud claims against CBB.  These two claims are legally distinct.  *See White*, 166 N.C.

App. at 294–95, 603 S.E.2d at 155–56.  However, as alleged by Plaintiffs here, both claims rest on the alleged existence of a fiduciary relationship.

41.    Plaintiffs allege, and CBB denies, that they had a fiduciary relationship with CBB when the Smiths and Siskey conspired to induce Plaintiffs to sell their CBB stock.  (*See* Merrell Compl. ¶¶ 182, 250; Strack Compl. ¶¶ 362, 479; Cochrane Compl. ¶¶ 199, 316.)  Thus, the Court must determine, as a threshold matter and in the absence of a written agreement providing otherwise, whether Plaintiffs have alleged sufficient factual allegations to support their contention that CBB, under North Carolina law, owed a fiduciary duty to Plaintiffs as its members.  CBB contends that, in accordance with well-established corporate law principles, CBB did not owe such a duty to its members.  (Mem. in Supp. 13–17.)  The Court agrees.

42.    This Court has previously ruled that a corporation does not owe a reciprocal fiduciary duty to its directors and officers.  *See Talisman Software, Sys. & Servs. v. Atkins*, 2015 NCBC LEXIS 108, at *12 (N.C. Super. Ct. Nov. 18, 2015) ("In North Carolina, while directors and officers of a corporation generally owe a fiduciary duty *to the corporation*, . . . a corporation does not owe a reciprocal fiduciary duty to its directors and officers." (citations omitted)); *Kingsdown, Inc., v. Hinshaw*, 2015 NCBC LEXIS 30, at *27 n.9 (N.C. Super. Ct. Mar. 25, 2015) (stating that an officer's contention that the corporation owed her a fiduciary duty "is simply not the law"). This same reasoning should apply here, particularly because by default an

LLC's members do not owe a fiduciary duty to the LLC in the first place.[12] *See Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473, 675 S.E.2d 133, 137 (2009).

43.  It appears that Plaintiffs contend that CBB owed them a fiduciary duty on the basis of Michael's alleged status as CBB's majority interest holder.  (Mem. in Opp'n 2.)  This argument misses the mark.  Any fiduciary duty arising from Michael's status as CBB's majority interest holder is a duty he, not CBB, owed to Plaintiffs.  *See Corwin*, 371 N.C. at 616, 821 S.E.2d at 737 (noting that "the majority stockholder of a corporation owes fiduciary duties to the minority stockholders"); *Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *9 (N.C. Super. Ct. Mar. 9, 2016) (explaining that, under some circumstances, "a holder of a majority interest who exercises control over the LLC owes a fiduciary duty to minority interest members"); *see also Bateman v. JAB Wireless*, No. 2:14-cv-147-RJS, 2015 U.S. Dist. LEXIS 88094, at *12 (D. Utah July 6, 2015) ("The existence of a fiduciary relationship between a majority shareholder and minority shareholders is not a remarkable proposition.  And it is not the same thing as a fiduciary relationship between a corporation and its own shareholders.").

44.  And to the extent that Plaintiffs seek to hold CBB vicariously liable for the Smiths' alleged breach of fiduciary duty and constructive fraud by operation of the respondeat superior doctrine, this theory fares no better.  (*See* Merrell Compl. ¶ 287;

---

[12] The Court makes no determination as to whether CBB's operating agreement might create a fiduciary relationship between CBB and its members (however unlikely that may be), since the Court has not been presented with the operating agreement for review and the fiduciary duty claimed by Plaintiffs here does not arise from any language in an operating (or other written) agreement but solely by virtue of Michael's majority interest in CBB. *See Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *10–11 (N.C. Super. Ct. Aug. 7, 2017) ("The rights and duties of LLC members are ordinarily governed by the company's operating agreement, not by general principles of fiduciary relationships.").

Strack Compl. ¶ 524; Cochrane Compl. ¶ 365.) Indeed, permitting Plaintiffs as CBB's members to hold the LLC vicariously liable for its agents' alleged breach of fiduciary duty or constructive fraud would effectively shift the cost of these torts from the agents to the members, the group harmed by these torts, given that the members own the LLC. *See, e.g.*, *Radol v. Thomas*, 772 F.2d 244, 258–59 (6th Cir. 1985) (relying on this reasoning in rejecting an attempt by a corporation's shareholders to hold the corporation vicariously liable for its directors' breach of fiduciary duty). "[S]uch a result would be flatly inconsistent with the rationale of vicarious liability." *Id.* at 259.

45. In sum, having considered North Carolina's default rules for LLCs and other relevant corporate law principles, the Court concludes that Plaintiffs have not alleged facts sufficient to establish the existence of a fiduciary relationship between them and CBB. Nor may they hold CBB vicariously liable for the Smiths' alleged breach of fiduciary duty and constructive fraud on the pleaded facts. Consequently, Plaintiffs' breach of fiduciary duty and constructive fraud claims against CBB, whether asserted directly or vicariously, are dismissed.

## C. **Fraud by Omission/Concealment and Fraud in the Inducement**

46. Next, the Court considers Plaintiffs' two common law fraud claims against CBB: fraud by omission/concealment and fraud in the inducement. It is unclear from Plaintiffs' Complaints how exactly these two claims differ. At bottom, both claims are based on the same core allegations, specifically, that the Smiths concealed material information from Plaintiffs relating to Plaintiffs' decision to sell their ownership interests in CBB. (*See* Merrell Compl. ¶¶ 184–201, 203–16; Strack Compl.

¶¶ 383–96; 409–24; Cochrane Compl. ¶¶ 220–33; 246–61.) Moreover, Plaintiffs' briefing is completely devoid of any discussion about their fraud in the inducement claim. (*See generally* Mem. in Opp'n.) The Court thus concludes that Plaintiffs' two fraud claims against CBB are identical to each other, and as a result, the Court will analyze both claims together as one fraudulent concealment claim.

47. The elements of fraud are a "[f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007) (citation omitted). Fraudulent concealment, also referred to as fraud by omission, occurs when one party was required (i.e. had a duty), but failed, to disclose to another party material information relating to a transaction between the parties. *See Harton v. Harton*, 81 N.C. App. 295, 297, 344 S.E.2d 117, 119 (1986); *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *7–9 (N.C. Super. Ct. June 18, 2007). Because "silence is fraudulent only when there is a duty to speak," to state a claim for fraud by omission, the plaintiff must allege that the defendant "had a duty to disclose material information to [the plaintiff]." *Lawrence*, 2007 NCBC LEXIS 20, at *8 (citing *Griffin v. Wheeler-Leonard & Co.*, 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976)). A duty to disclose arises when:

> (1) there is a fiduciary relationship between the parties to the transaction; (2) a party has taken affirmative steps to conceal material facts from the other; or (3) one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence.

*Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 2015 NCBC LEXIS 64, at *14 (N.C. Super. Ct. June 19, 2015) (quoting *Harton*, 81 N.C. App. at 298, 344 S.E.2d at 119).

48. Fraud by omission must be pled with particularity. *See* N.C.G.S. § 1A-1, Rule 9(b). As this Court has observed, "fraudulent concealment or fraud by omission is, by its very nature, difficult to plead with particularity." *Lawrence*, 2007 NCBC LEXIS 20, at *9 (quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997)). In *Lawrence*, the Court adopted the following factors to assist it in testing the sufficiency of allegations supporting a fraud by omission claim under Rule 9(b):

> (1) the relationship [between plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Id.* at *9–10 (quoting *Breeden*, 171 F.R.D. at 195–96). In addition, the Court has explained that "[t]o show a duty to disclose based on affirmative steps to conceal a material fact, a plaintiff must allege the specific affirmative acts taken to conceal that fact." *Vitaform, Inc. v. Aeroflow*, Inc., 2020 NCBC LEXIS 132, at *31 (N.C. Super. Ct. Nov. 4, 2020).

49. With these principles in mind, the Court turns to CBB's contentions. CBB seeks dismissal of Plaintiffs' fraudulent concealment claim on two grounds. CBB first argues that, to the extent this claim is based on an alleged fiduciary duty owed by the

Smiths/CBB to Plaintiffs, the claim should be dismissed. (Mem. in Supp. 18–19.) Second, it contends that the claim is not pled with sufficient particularity. (Mem. in Supp. 19–22.) The Court addresses each of these arguments in turn.

50. As set forth above in section IV.B., CBB did not owe a fiduciary duty to Plaintiffs, and it also cannot be held vicariously liable for the Smiths' alleged breach of fiduciary duty. Therefore, Plaintiffs' fraudulent concealment claim against CBB cannot be based on a purported fiduciary relationship with CBB. However, having carefully examined Plaintiffs' Complaints, the Court concludes that Plaintiffs have met the heightened pleading standard for a fraudulent concealment claim based on affirmative steps taken to conceal material facts.

51. First, Plaintiffs have pled the five general elements of fraud. (*See* Merrell Compl. ¶¶ 189–99; Strack Compl. ¶¶ 388–96, 405–06; Cochrane Compl. ¶¶ 225–33, 242–43.) In addition, Plaintiffs' Complaints on balance contain sufficient factual allegations to put CBB on notice of the nature of Plaintiffs' fraud claim against CBB, consistent with the *Lawrence* factors as well as the purpose behind the Rule 9(b) particularity requirement. *See Biopharm., Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, at *63 (N.C. Super. Ct. Sept. 28, 2018) ("The purpose of Rule 9(b) is to provide a defendant with sufficient notice of the fraud alleged 'in order to meet the charges.'" (quoting *Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981))).

52. Indeed, Plaintiffs specifically allege that the information that Michael shared with Siskey about an investment group being interested in purchasing CBB was material to Plaintiffs' decision to sell their CBB stock "because

neither . . . Plaintiffs nor any reasonable person would have sold their shares, much less to . . . Siskey," if that information had been disclosed to them. (*E.g.*, Merrell Compl. ¶ 190.) Plaintiffs also point to specific affirmative acts that the Smiths took to conceal this alleged material information. These acts include: (1) Michael's decision to give Siskey the information, but not Plaintiffs; (2) the Smiths' communications with CBB's members in 2007 that omitted this same information (i.e., Jennifer's March 2, 2007 email to the members and the March 29, 2007 business meeting); and (3) the Smiths' continued concealment of the information amid their processing/approval of Plaintiffs' stock transfer forms after CBB's legal counsel notified Siskey by letter dated October 3, 2007 (with a copy to Michael) that not disclosing to CBB's members the information about the potential sale of the company could trigger a federal securities law violation. (*See* Merrell Compl. ¶¶ 34; 45, 56, Exs. 11–13; Strack Compl. ¶¶ 81, 92, 106, Exs. 26–28; Cochrane Compl. ¶¶ 98, 111, 123, Exs. 30–32.)

53.    All of these allegations, viewed together and in the light most favorable to Plaintiffs, state with sufficient particularity a fraudulent concealment claim against CBB based on the Smiths' failure to disclose to Plaintiffs the same material information that had been provided to Siskey in connection with Plaintiffs' decision to sell their CBB stock. Thus, the Court declines to dismiss Plaintiffs' fraud in the inducement claim and fraud by omission/concealment claim against CBB, whether asserted directly or vicariously.

### D. State Securities Fraud

54. The Court next addresses Plaintiffs' claim against CBB under the North Carolina Securities Act (the "NCSA").

55. Plaintiffs allege that CBB violated sections 78A-12(a)(1) and 78A-12(a)(5) of the NCSA, thereby triggering liability under section 78A-56(b1) of the statute. (*See* Merrell Compl. ¶ 221; Strack Compl. ¶ 431; Cochrane Compl. ¶ 268.) Section 78A-12(a)(1) makes it unlawful to "[w]illfully quote a fictitious price with respect to a security" while section 78A-12(a)(5) makes it unlawful to "[e]mploy any other deceptive or fraudulent device, scheme, or artifice to manipulate the market in a security, including the issuance, with the intent to deceive or defraud, of analyses, reports, or financial statements that are false or misleading in any material respect." N.C.G.S. § 78A-12(a)(1), (5).[13] Violating these two provisions can lead to primary liability under section 78A-56(b1). *See* N.C.G.S. § 78A-56(b1); s*ee also Tillery Envtl. LLC v. A&D Holdings, Inc.*, 2018 NCBC LEXIS 13, at \*60–74 (N.C. Super. Ct. Feb. 9, 2018) (explaining the distinction between primary and secondary liability under the NCSA).

56. In addition, Plaintiffs allege that CBB is liable as a "control person" under section 78A-56(c)(1) of the NCSA. (*See* Merrell Compl. ¶ 224; Strack Compl. ¶ 434; Cochrane Compl. ¶ 271.) In pertinent part, section 78A-56(c)(1) imposes secondary liability on "[e]very person who directly or indirectly controls a person liable under subsection (a), (b), or (b1) of [section 78A-56]." N.C.G.S § 78A-56(c)(1); *see also Tillery*,

---

[13] The acts proscribed by section 78A-12 are considered "manipulation of the market." *See* N.C.G.S. § 78A-12.

2018 NCBC LEXIS 13, at \*64–66 (explaining secondary liability under section 78A-56(c) of the NCSA). Accordingly, to state a claim against a "control person" under section 78A-56(c)(1), the plaintiff must first state a claim against a person liable under sections 78A-56(a), 78A-56(b), or 78A-56(b1). *See Tillery*, 2018 NCBC LEXIS 13, at \*68 ("[T]o bring a claim against a person under [section 78A-56(c)(1)], the claimant must first state a claim against the primarily liable person."). Plaintiffs here specifically allege that CBB exercised control over Siskey in connection with the misconduct that created primary liability for Siskey under sections 78A-56(b) and 78A-56(b1), thus making CBB secondarily liable as a "control person" pursuant to section 78A-56(c)(1). (*See* Merrell Compl. ¶ 224; Strack Compl. ¶ 434; Cochrane Compl. ¶ 271.)

57. CBB makes two arguments for dismissal. CBB first contends that because Plaintiffs' NCSA claim is "based on the same core of operative facts" as the Smiths'/CBB's alleged violation of their fiduciary duties to Plaintiffs, Plaintiffs' NCSA claim fails. (Mem. in Supp. 18–19). Second, CBB argues that it was not a "control person" within the meaning of the NCSA as to the transfer of Plaintiffs' CBB stock to Siskey because the transfers were executed by Michael in his capacity as CBB's majority interest holder, not in his capacity as an agent of CBB. (Reply Br. 7.) Both arguments are misguided.

58. First, contrary to CBB's assertion, Plaintiffs' Complaints do not reflect that their NCSA claim is grounded in an alleged fiduciary duty owed to them by the Smiths/CBB. As noted, Plaintiffs seek to hold CBB both primarily and secondarily

liable under sections 78A-56 (b1) and 78A-56(c)(1) of the NCSA, respectively, and liability under these provisions does not depend on the existence of a fiduciary relationship. *See* N.C.G.S §§ 78A-56(b1)–(c)(1).

59.    Next, although CBB contends that it "was not a 'control person' over the share transfers" at issue, (Reply Br. 7), Plaintiffs' Complaints allege that CBB is secondarily liable as a "control person" under section 78A-56(c)(1) *because of Siskey's alleged primary liability under sections 78A-56(b) and 78A-56(b1)*. The critical question is therefore not whether CBB controlled the share transfers, as CBB avers, but whether CBB exercised control (direct or indirect) over Siskey, *see* N.C.G.S. § 78A-56(c)(1). Yet, CBB does not move to dismiss Plaintiffs' NCSA claim on the basis that CBB lacked the requisite control over Siskey with respect to his alleged misconduct, (*see generally* Mot. to Dismiss), nor argues to that effect, (*see generally* Mem. in Supp.; Reply Br.). Moreover, CBB fails to challenge its own alleged primary liability under sections 78A-56(b1).[14]

60.    For all these reasons, the Court declines to dismiss Plaintiffs' NCSA claim against CBB at this early stage of the litigation.

E.      **Negligent Misrepresentation**

61.    Plaintiffs bring a negligent misrepresentation claim against CBB in the alternative to their fraudulent concealment claim. (Merrell Compl. ¶¶ 265–84; Strack ¶¶ 493–512; Cochrane Compl. ¶¶ 335–53.) Here again, CBB contends that

---

[14] Consistent with the Court's determination above in section IV.A. regarding Plaintiffs' vicarious liability/respondeat claim, Plaintiffs may base CBB's alleged NCSA primary liability on the conduct of Michael, CBB's CEO.

this claim fails because it is based on the Smiths'/CBB's alleged violation of their fiduciary duties to Plaintiffs and because the claim is not pled with sufficient particularity. (Mem. in Supp. 18–19). The Court agrees that this claim against CBB is predicated on a fiduciary relationship between the Smiths/CBB and Plaintiffs and thus should be dismissed.

62. "Negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *BDM Invs. v. Lenhil, Inc.*, 264 N.C. App. 282, 299, 826 S.E.2d 746, 761 (2019) (alterations and citation omitted). Here, Plaintiffs' Complaints all allege that the Smiths and CBB owed a "fiduciary duty" to Plaintiffs. (Merrell Compl. ¶¶ 268–69; Strack ¶¶ 496–97; Cochrane Compl. ¶¶ 337–38.) Plaintiffs' briefing also repeats that assertion. (Mem. in Opp'n 8–9.) And unlike Plaintiffs' fraudulent concealment claim, Plaintiffs' Complaints do not reveal another cognizable theory for imposing a duty on CBB as to the negligent misrepresentation claim even when read in the light most favorable to Plaintiffs.

63. As a result, because the Court has determined that CBB did not owe a fiduciary duty to Plaintiffs and cannot be held vicariously liable for the Smiths' alleged breach of fiduciary duty, the Court dismisses Plaintiffs' negligent misrepresentation claim against CBB, whether asserted directly or vicariously.

**F.    Civil Conspiracy**

64. Plaintiffs also bring a civil conspiracy claim against CBB. (Merrell Compl. ¶¶ 252–263; Strack Compl. ¶¶ 482–492; Cochrane Compl. ¶¶ 319–334.) CBB

challenges this claim on only one ground, namely, that the claim is based on the Smiths'/CBB's alleged violation of their fiduciary duties to Plaintiffs. (Mem. in Supp. 18–19). Plaintiffs' civil conspiracy claim appears to be based on the alleged fraudulent scheme that Siskey and the Smiths employed to allow Siskey to purchase Plaintiffs' ownership interests in CBB. Since Plaintiffs' fraudulent concealment claim against CBB has not been dismissed, Plaintiffs may base their civil conspiracy claim against CBB on the same misconduct giving rise to the fraud claim. *See Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002) ("There is no independent cause of action for civil conspiracy. . . . Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement." (citation omitted)). Accordingly, the Court declines to dismiss Plaintiffs' civil conspiracy claim against CBB.

## V.     CONCLUSION

65.     For the foregoing reasons, the Court hereby **GRANTS** in part and **DENIES** in part the Motion to Dismiss as follows.

   a. The Court **DENIES** the Motion to Dismiss as to Plaintiffs' **vicarious liability/respondeat superior claim** against CBB as asserted within the Merrell Complaint, the Strack Complaint, and the Cochrane Complaint.

   b. The Court **GRANTS** the Motion to Dismiss as to Plaintiffs' **breach of fiduciary duty claim** and **constructive fraud claim** against CBB as

asserted within the Merrell Complaint, the Strack Complaint, and the Cochrane Complaint, and those claims are hereby **DISMISSED**.

c. The Court **DENIES** the Motion to Dismiss as to Plaintiffs' **fraud by omission/concealment claim** and **fraud in the inducement claim** against CBB as asserted within the Merrell Complaint, the Strack Complaint, and the Cochrane Complaint.

d. The Court **DENIES** the Motion to Dismiss as to Plaintiffs' **claim against CBB under the NCSA** as asserted within the Merrell Complaint, the Strack Complaint, and the Cochrane Complaint.

e. The Court **GRANTS** the Motion to Dismiss as to Plaintiffs' **negligent misrepresentation claim** against CBB as asserted within the Merrell Complaint, the Strack Complaint, and the Cochrane Complaint, and that claim is hereby **DISMISSED**.

f. The Court **DENIES** the Motion to Dismiss as to Plaintiffs' **civil conspiracy claim** against CBB as asserted within the Merrell Complaint, the Strack Complaint, and the Cochrane Complaint.

**SO ORDERED**, this the 22nd day of December, 2020.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases